Case number 14-2538, Dianna Jackson v. Trinity Health Michigan. Arguments not to exceed 15 minutes per side. And Mr. Berg, for the appellant, you may proceed. Thank you. Good morning, Your Honors. I would like to reserve five minutes for rebuttal. Fine. Your Honors, the trial court we believe should be reversed. The trial court ruled that there was no prima facie case established for race discrimination or age discrimination. And the evidence clearly establishes that a perfectly permissible, flexible prima facie case standard involves being in a protected class, being qualified, being discharged, and being replaced by someone not in a protected class. That's clearly what happened here. So the prima facie case is established. And I don't think there's really a dispute at this point on the appellee's part on that. However, the next step, of course, is to establish that the reasons given for the discharge were pretext. And in that situation, Your Honors, we have abundant evidence of pretext. To start, Diana Jackson was a very qualified individual. She was hired at the age of 58 after a long career already in a similar position in radiology in another establishment. Are you talking now about age discrimination or race discrimination or both? Well, I'll start race discrimination for the most part, yes. Actually, what I'll do right now is let me address age, because there's a very simple piece of evidence about the age case, and that's what I'm going to talk about. Well, the fact that she was hired at 58 seems to refute any age discrimination here. Your Honor, I would agree. That is an argument that can be made by an employer. We hired her when she was older. We're not going to fire her because she's older, except for one thing. I asked a simple question of one of the decision makers. I asked her, you thought that this employee was a top-down dictatorial-type manager. She said yes. I said, was that old school in your mind? But you said that. They didn't say that. That's your problem, I think. And there was a long pause, and then somebody said, well, yes, you could. You could. You don't have to, but you could. Your Honor, I did say it, but I asked her if that concept was in her mind. And I could have used, if this were a disability case, or I could have asked it in the race situation, I could have asked, is this? But you'd be in a much stronger position if she had volunteered. Well, we figure that's kind of old school sort of way of doing it. You're the one that came up with that connotation. They didn't. I fully agree. Okay. And normally these witnesses don't volunteer smoking gun indications of what was in their mind. Well, I don't know that I think that's smoking gun. I mean, what does old school refer to here? Not the person, not necessarily the thinking of the person, but just an idea. That idea of leadership is sort of old school. It isn't the way we do it these days. That doesn't have anything to do with age, necessarily. Not necessarily, Your Honor. All right. I agree. I would agree. I think old school and old fashioned have the flavor of a stereotype view of what somebody's doing, and therefore a jury should decide whether they meant. But the old school refers to a type of leadership. I mean, I'm struggling with why a style of, I mean, everything about the context of the remark, even if she'd volunteered it, wouldn't it all have been about a style of leadership? And I'm struggling with why favoring one style of leadership, top-down, bottom-up, necessarily points to age. That's not obvious to me. In our view, Your Honor, when you refer to a cliché or a stereotype, talking about old fashioned or old school, it brings to mind By itself. I do agree with you. It's not a great phrase by itself. And just for the sake of argument, I'll say she volunteered it. But we always take words in context. I mean, it's just a really important thing to do. And I don't understand how the context refers to anything other than a management style, which one could have at age 20, 30, 50, or 70. There are lots of dictatorial 30-year-olds. I mean, you can just have a view that says this is the way it's running. So I don't understand why that's an age point. I think that that is one way a jury could view that, Your Honor. I agree. It's susceptible to other interpretations such as the one you're saying. Isn't another problem that the question that plaintiff's counsel said, and that was old school in your mind, and the answer is you might call it that, which is not saying, oh, yeah. Boy, you could have been charged. Age discrimination by attorney. I think that the expression you could call it that does mean colloquially, and I might call it that. It's like saying one could call it that. She wasn't saying me. I don't believe it. But a jury could have said it either way. Is there any other point on the age discrimination, or is that the key point? That's the key point. Okay. I'll move to the race. So pretext here is established because you have a qualified individual, an African-American person coming in. Her first job is to report to another African-American female who rates her highly, rates her as being a strong leader, and rates her fields, compliments from her staff, and writes in Ms. Jackson's performance review, her staff is very complimentary of her accessibility and leadership. Of course, that review came in right after the guy that everybody despised left. I mean, in context and in relation to his leadership, I'm sure they were really glad to see her. Possibly. Oh, I mean, that's what the performance review suggests, and then those performance reviews began to be less laudatory. Am I right about that? Well, they're less actually, Your Honor, in the objective areas of the performance reviews, even by the subsequent vice president, Shannon Strebick, the objective parts are still good. They're still competent. In other words, Ms. Jackson is performing her job on an objective basis. Now, Mr. Osborne, her predecessor, left a mess. So the numbers, the actual objective factors in the department... But that's my point. By comparison, she started out looking really good. Yes, but we're talking about two different areas here. Objective, meaning the numbers that are produced in the department, and the subjective aspects of the job, which are interpersonal relationships and that sort of thing. It's the subjective areas of her job where we're saying there's evidence of pretext here because the deck was stacked against her from the beginning. And APLE points out, and it's true, that her direct supervisor, Strebick, was not overtly discriminatory. But what she did, and she's a Caucasian woman, approximately the same age as the Caucasian women who are Ms. Jackson's subordinates. So they're sandwiching the African-American appellant. And one specifically, especially one of the subordinates, Paige, she had a bias towards black people. And she and her colleague, Ely, expressed it to Ms. Jackson early on in Ms. Jackson's employment. They came to her saying, Osborne told us you're going to fire us because you're black and we're white. This was shocking to Ms. Jackson because, of course, it had nothing to do with any of her thoughts. But in their minds, the issue of race was apparently in the forefront in this employment context. So now there's a series of events. Those remarks were by decision-makers, just remind me. Okay, so our theory is that the subordinate, Paige, who was still a manager, under the cat's paw law, the cat's paw theory, she was a decision-maker because she influenced the decision-maker. So yes, in that sense, the comment of you're going to fire us because you're black and we're white was made by a decision-maker under the cat's paw theory. And which decision-maker did she influence? Strebick. Paige influenced Strebick. Let's see. So one of the things you say on the pretext point on the race claim is that all of their explanations were subjective and that the earlier boss did not support them. And I thought some of the explanations were objective. There were some actual scores. And then I thought her prior boss did endorse the assessments that came later. So I guess I was struggling with that argument on the pretext issue. Your Honor, so the prior boss, the African-American boss, rated the plaintiff highly in the subjective areas. I know, I know. When some later issues were brought up, she said, okay, I see that. So endorsed. In a sense, endorsed. But there was no discipline, no punishment, no friction when she was the... That doesn't matter. I mean, I thought the whole point on pretext was are you making this up to hide this illegitimate explanation? And if that person endorsed the later boss's position, criticisms, that seems to me, I'm not saying it's dispositive, but it does seem to me to show there was this detraction in the idea there was this big disparity between your two bosses, which I really don't think there was. Respectfully, Your Honor, I disagree. I think that there was no actual endorsement of point-by-point criticism, which the new boss was levying here. And the main parts of the new boss's criticisms were these events where the African-American plaintiff is attempting to levy discipline on her white subordinate and is not being allowed to do that by her white superior. And so you can see in the document which sort of describes the reasons for termination that the events that I'm talking about, the reversal events, which is how I termed it in my brief, they're the main reasons why the plaintiff is called on the table and at one point, September, one week after, Page says, I think something official has to be done. One week after, the plaintiff is called on the carpet and she has to go on medical leave now for six weeks. By then, the decision is already made. The replacement, Moyer, the white replacement, is already touring the workplace while the plaintiff is on the medical leave. And so by the time she comes back, the cards are stacked and she's gone within a month, month and a half. I see that your red light is on. If you want to save your rebuttal time, you may. Thank you, Your Honor. May it please the Court, Daniel Bretz on behalf of the defendant, Appleby, Trinity Health. Your Honor, the district court's judgment should be affirmed. The district court got it right on the Elliott-Larson Civil Rights Act as to the race claim under the state law and got it right on the age claim. I'll stop there and deal with that claim briefly. The sole evidence, the court's correct, the sole evidence of any age discrimination is a comment plaintiff's counsel made at the Vice President of Human Resources deposition taken some two and a half years after the plaintiff's termination where plaintiff's counsel asked, is that old school in your mind? And she said, you might say that. That's the sum total of age discrimination evidence. You might say that. And the court's correct. That's not a euphemism for age. It's a description plaintiff's counsel chose of her management style for which she was criticized. But it was an objective observation of her management style. But lawyers can say you fired her because she was old. If the answer is yes, you don't say, well, that was your word. You said yes. You're stuck. That would be correct. If it was a spot-on admission to a direct question like that, that would be a very different thing than what happened here. Old school is a cliché. It could mean a variety of different things. In fact, I've cited cases, the Kirkpatrick case that I cited in the court, where the court rejected the use of the term old school as a euphemism or a descriptor of an age of the plaintiff. And her statement was hardly an endorsement. You might say that. I think it was a polite answer, but it certainly wasn't an endorsement. Beyond that, the district court noted and found that the plaintiff's replacement was within six years of the plaintiff's age. And under established law, the Gross Gene case, that destroys a prima facie case of age discrimination. The plaintiff was replaced by Donna Moyer, who was 55 years old. I believe she was a little over five years younger than the plaintiff, but that's within that six-year window under Gross Gene. It's a bright-line test. With regard to the prima facie case under Title VII, the district court stopped short and did not analyze the pretext factors, which we did brief and which we briefed again in this court. The district court did not analyze the second prong of the fourth element of the prima facie case. It said the fourth prong consists of evidence whether similarly situated non-protected people were treated more favorably, and the court stopped there. The second prong does include a view of whether the plaintiff was replaced by a non-protected person. And that was satisfied here? That was satisfied. The prima facie case is satisfied here. Based on that Sixth Circuit precedent. So we get to pretext. Summary judgment should be upheld on pretext. Pretext is analyzed at three different levels by this court and other courts of appeals. First, whether the reasons given had no basis in fact, whether there's any evidence that these aren't the true reasons. Secondly, whether the reasons given didn't actually motivate the decision. And thirdly, whether the reasons given are insufficient to warrant the action taken. Isn't there a real problem when an employer says, we don't like your management style. And really what they're saying is we don't like you because you're a woman or we don't like you because you're black or we don't like you because you're old. But they cover it with this, your management style isn't what we want. Right. That is not the case here. Yes, they use the term we're dissatisfied with your management. She was a manager of a very large and important department. Everybody who goes to the hospital goes through the radiology department. It's 125 employees under her supervision. And her management style was lacking. And that wasn't an empty conclusion. That was based on reports that cut across all lines in all sectors of the hospital. It cut across racial lines. In other words, African Americans reported her management was lacking. It was based upon objective observation of poor turnaround time, high radiation levels, lack of accreditation. And, yes, it was based on reports from subordinates who said, she's targeting us, she's harassing us. There were official reports filed. She's not listening to us and she's jumping to conclusions. This leadership style was verified by independent investigation by the decision makers. They looked into some of her recommendations. Mr. Berg calls it a reversal. Well, yes, in fact, it was when she came to them and said, I want to fire one of my subordinates. Did you speak to her about it? No. Did you look into the facts? No. How long ago did you learn this? Two and a half weeks ago. This involved potential disclosure of private health information. Did you determine if potential private health information was disclosed? No. So the decision makers investigated that, found there was no information disclosed, the employee had followed proper protocols, had gotten approval to remove these computers, and plaintiff had never investigated it. That was early on. And, yes, that was a reversal because she was 180 degrees wrong based on an independent investigation. An African-American employee who investigated it told the decision maker she seemed to be more concerned with firing her employee than finding out the facts. All of this culminated in September when the plaintiff was told you're in job jeopardy, you need to improve, you need to write a management improvement program. The plaintiff acknowledged all of this occurred. You need to get a job coach. You need to improve your operations. The plaintiff didn't do that. She didn't turn in her management report. She had to be asked to turn it in. When she did, it was deficient. Now, plaintiff points at Erica Page, claiming she somehow conspired with upper-level management decisions. And only Erica Page, plaintiff claims, betrayed any discriminatory animus. And I can talk about the two bases for that in a second. But mind you, by September, when she's put in job jeopardy, after that, reports come in, complaints come in, not from Page, not from any of plaintiff's subordinates, but now from the CFO of the hospital, from the director of physician relations, and ultimately the tipping point is two physicians come to Ms. Strebick and say, we can't work with her anymore. These are not employees of the hospital. These are two doctors on staff, the radiologists, who say we can't work with her. She doesn't solve our problems. Quality is poor. Customers aren't getting service. We don't find her competent. Page has nothing to do with any of that. In fact, at the time plaintiff is terminated, the very decision-makers the plaintiff complains about had suspended and disciplined Page, and she was pending termination. Page wasn't even in the hospital. She'd used inappropriate language at a team meeting. There was a complaint about her, investigated. Ms. Strebick and Ms. Murphy suspended her. When she came in for the investigative hearing, she said, I quit. I don't want to do this anymore. Now, I cited to the court last week the recent decision by Judge Daughtry in Mabin v. Southwest Medical Center, where the plaintiff pointed to a co-worker in a race discrimination case and said she wasn't fired and I was, and she did similar things. And the court held, well, that co-employee had been disciplined and suspended and resigned before she could be terminated. That is not a comparable. Okay? In this case, this Page isn't a comparable because she's not at the same level as the plaintiff. She's a subordinate employee. But even so, the same decision-makers, plaintiff claims made a bad decision in her case, disciplined and suspended Page, and she was facing termination. Now, what is the evidence that Page had an animus? Two straight comments. One, this comment that occurred three years before plaintiff was terminated by plaintiff's predecessor, who was a younger white male who had been terminated for poor performance and poor management. Allegedly, he told Page or Ely, plaintiff didn't know who, who told plaintiff that Osborne says, we're going to get fired too because we're white. I asked plaintiff, did you ever hear that from Osborne? No. At this time, was Osborne a former employee? Yes. Did you report that to anyone? No. That is rank hearsay. Osborne's an out-of-court declarant. He's speaking on a matter not within his scope of employment or agency after his agency relationship ended. Those are the tests under 801 D2D. It has to be within the scope of the agency during the term or the relationship of the agency. Neither is satisfied. It's double hearsay when repeated by Page or Ely, whomever, to plaintiff. And at bottom, it has nothing to do with the ultimate decision. Page wasn't involved in the decision to terminate plaintiff's employment. Page hadn't even complained about plaintiff in the four to six months leading up to the termination, whereas many others had. And you're saying that time-wise that came long before? Plaintiff said that came in the first few weeks of her employment, three years before her termination. She was hired in January of 2008, I believe, and terminated in January 2011. So that's the first allegation against Page. The second is plaintiff testified,  I asked the plaintiff what was the context of that, who was around, the plaintiff didn't know. Page's deposition was taken and her testimony about the context was unrebutted for purposes of summary judgment. She said it was plaintiff who brought up the subject of race. Page was playing a tape recording of her singing in church, in a church group. And plaintiff said to Page, how does a white girl get such a bluesy voice? Page said, I responded, my father says we have African-American blood in my family. That was the total comment, some total of the conversation, non-work-related discussion, plaintiff brought up the subject of race, Page responded. Again, at most a stray remark, ambiguous and abstract, certainly no conclusion of animus can be drawn from that, given that context. My first comment, do you have to exclude it because it's hearsay, if it's admitted to show the motive of Page, that Page is afraid for her job, and thinks, Page thinks, that the plaintiff has her own animus against whites? Well, that doesn't have anything to do with whether the decision was motivated for reasons other than plaintiff's performance. Page wasn't involved in that decision, the comment was unrelated. So that's going to other parts of the cat's paw theory, that the cat's paw theory is not appropriate because Page really was not attempting to, in your mind, was not attempting to motivate the decision makers to fire the plaintiff. Correct, and the facts are, Page was wholly uninvolved. Decision makers weren't using Page, that's not how the cat's paw theory works, the decision makers use a subordinate. I think plaintiff's theory, and I don't want to speak for him, is that Page got the decision makers to do her bidding. So Page was the clever monkey in the fable, and the supervisors were the cat's paw who burned their paw when they grabbed the chestnut. Is that the reverse of how it usually works? It's exactly a reverse cat's paw theory, where he's claiming a subordinate... Maybe it's a monkey's paw theory. The monkey's the clever one in the scenario. The monkey gets the cat to do his bidding and the cat burns his paw, that's how it works, but sorry. His theory is that a subordinate somehow is manipulating superiors two levels up from her. The facts don't bear that out whatsoever, and it's based solely on this hearsay comment, and again, Page isn't even in the hospital when Plaintiff is terminated. Page isn't even part of the series of events that occur from September to January that led to the termination. And Page's complaints were investigated, and the hospital came to an honest belief, based on particularized facts, based on its investigation... Let me ask this, because I've gotten a little lost, but wasn't the comment that we're talking about wasn't made by Page? It may have been repeated by Page or by Ely, but it was made by somebody who's long since gone, is that right? Correct. At a time when he was already gone, after Plaintiff had replaced him. Because his comment was, now that she's in there... Better watch out. Watch out, yes. That was the whole comment, according to Plaintiff. Page and Ely denied the comment. And Osborne had a motive in the sense, notwithstanding that he was gone, Osborne has been fired, and he's been replaced by this woman, who happens to be our Plaintiff here, and he's angry. And so he wants to foster discontent among the people who are there, so that they will make it hard for this new person taking his place. Well, I don't disagree. I'm just spinning this out. And I don't disagree. Osborne's a disgruntled, former, terminated employee. That's all very plausible. And often people who are replaced by somebody want that person out, so that that person has a hard time. Correct. And that would have nothing to do with her or his or anyone's race or age. The question that you have been trying to focus on is, did the decision-maker have a racial animus here? Correct. Was there any pretext shown? Correct. And there's no allegation, no showing that the decision-makers ever knew about this statement of Osborne, ever knew about this statement of Page. There's no showing they ever subscribed to it. In fact, I directly asked, and Mr. Berg conceded, there's no evidence of animus or any racial motivated actions on that. The decision-makers who decided to fire the plaintiff did not know about the Page-Ely meeting with the plaintiff and did not know about the Osborne-alleged comment to Page-Ely. That's correct, 100% correct. And, you know, Judge Moore, you asked about, isn't leadership a subjective category? With all due respect, in the, hard to say, Indumedia case versus Chase, your opinion, you ruled that the plaintiff was terminated for poor leadership, poor management. The defendant came forward with particularized facts to show specific examples of poor leadership, and I believe that's what we have done here. Now, the honest belief rule, which this court subscribes to at the pretext level, states that so long as the defendant articulates its reasons and shows particularized facts for its honest belief of poor performance, that's sufficient, absent some showing of discriminatory motivation, even if the employer turns out to be wrong or mistaken. And your red light is on. Thank you. Thank you very much. Briefly, Your Honors, the plaintiff is not attempting to get Osborne's comment into evidence. It's Page and Ely's stating what Osborne told them. It's not offered to prove the truth of what Osborne was saying. It's to show their state of mind, which is race conscious. They're bringing race into the workplace with this comment to Diana Jackson and their current employees and their management employees. Secondly, the cat's paw theory, my understanding of it, is when a decision maker is influenced by someone else. Now, there's law that that someone else has to be some sort of person with authority, and in this case, Page is a manager here. And Page has many subordinate employees under her control. She has authority in the workplace. She is influencing Strebick to discharge the plaintiff based on these subjective things, these subjective reasons about management style. The memo, the email by Page to the HR person, Ani McNeil, one week before Strebick comes down on the plaintiff, says, when you have some time, I need to speak with you in regards to another harassment issue with Diana. I think the time has come to do something official. This is a subordinate employee, subordinate to the director, who is saying, I think the time has come to do something official. Well, what has been being done unofficially? That's our question. I think a jury should evaluate this. Now, an appellee says, well, that meant she thinks she now has to file a formal harassment complaint. She never did that. This is about Page talking to superiors and saying, all right, let's go, let's get rid of Diana, my director. Now, going back to the computer issue, which really started the ball, started everything going downhill for the plaintiff, Page is a subordinate to the plaintiff, to the director. She is letting department equipment go out of the department without telling the director. This is not done. This is not proper procedure. The forms were strange. The memos were strange. And it turns out that because the plaintiff was going on vacation when she discovered it, yes, two weeks later she reported it. So now she's the one that's being criticized. In August, just before this memo about, I think something official has to be done,  had made mistakes in payroll. Paying people more money, white people it turns out, than they should have been paid. So the director of this department, the plaintiff, wanted to punish Page. And again, a reversal. Strebick is saying, well, it looks like you're out to get her. Well, in a sense she was because she was her superior in authority. And there had been these other incidents where there were these reversals. The prima facie case is the replacement. It's not disparate treatment and comparables. But we do say Page, in this situation, although a subordinate in title, was a comparable similarly situated employee to the director because all these incidents arose. They were treated as though they were of similar authority. And so functionally, Page is a comparable. Do you have any case that says that somebody who is a subordinate and is being supervised by the plaintiff is a comparable to the plaintiff? I don't to cite to you today, Your Honor. Okay. Thank you. Thank you. Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?